STATE OF MISSOURI at the Relation of AGNES D. BOWDON, Relator, v. PERRY T. ALLEN, WALTER E. BAILEY and ROBERT J. SMITH, Judges of the Springfield Court of Appeals.—85 S. W. (2d) 63.

Court en Banc, July 10, 1935.

*Sam J. Corbett* and *Shelley I. Stiles* for relator.

*Ward & Reeves, Fordyce, White, Mayne & Williams* and *R. E. La Driere* for respondents.

HAYS, J.—The relator, Agnes D. Bowdon, seeks by our writ of certiorari to quash the opinion and record of the Springfield Court of Appeals in the case of Agnes D. Bowdon v. Metropolitan Life Insurance Company, 78 S. W. (2d) 474, lately pending in that court. In the circuit court the relator recovered a judgment and verdict for $1000. This judgment was on appeal reversed and remanded by said Court of Appeals with directions. As grounds for quashal of said opinion the relator charges that the same is in conflict with several specified decisions of our court. The case was heard on a former appeal and is reported in 59 S. W. (2d) 787. ■ We look to the assailed opinion for the facts, and only to it.

The action reviewed by the Court of Appeals is based on a policy of insurance, an Arkansas contract, of date August 12, 1929, of said insurance company, insuring Dewey B. Bowdon, deceased, naming his wife, the said Agnes D., as beneficiary. The insurance company's answer to the petition alleged that the deceased brought about his own death by suicide, the answer basing the defense on a provision of the policy which reads: "If the insured, within one year from the date of issue hereof, die by his own hand or act, whether sane or insane, the liability of the company hereunder shall be limited to an amount equal to the premiums which have been received, without interest."

On February 5, 1930, the insured was run over and killed by a passenger train, near Truman, Arkansas. An inquest was held in the county where the death occurred and the coroner's jury's verdict was "that said Dewey B. Bowdon came to his death by intentionally jumping in front of a Frisco passenger train No. 108." The verdict was by the insured's widow attached to the proof of death of her husband as made by her to the insurance company.

In the opinion we find the following recital of the "undisputed evidence" and authorities under which the case was ruled, and the ruling itself; the ruling being to the effect that at the close of the whole case the trial court should have directed a verdict for the plaintiff in the amount of premiums paid on the policy:

"Counsel for appellant states in its printed argument that *the only real question in the case was whether death was suicidal,* and that on that issue there was no conflict in the evidence.

"If the foregoing statement be correct, there is nothing further to consider in this case.

"There were but three witnesses who testified upon the suicide feature of the case, to-wit: Clyde A. Houston, Curtis Hurst and Leo Alberto. While in some minor details there was apparently some difference as to what the witnesses saw of the conduct of deceased, within the space of a half minute to a minute of the time immediately preceding the striking and killing of deceased by the railroad train, yet in substance the testimony was practically the same.

"The first, Clyde A. Houston, said he was twenty-seven years of age and lived a mile and a quarter from Herget. He had lived around Jonesboro all his life. That he recalled seeing deceased February 5, 1930, in Nettleton, at about eight o'clock in the morning. That he saw him later that day at the railroad crossing near where he was killed; he was then fixing a flat tire. Witness turned in on that crossing himself, and was walking alone. That he did not speak to deceased when he passed him; that, as witness passed deceased, the latter was standing at the left front wheel of his car. That, when witness stepped off his truck, deceased turned and went back behind his car. Witness next saw him when the train whistled at Herget. By that time deceased had walked from the highway to within about five feet of the track, where he stood until the train got something like 2½ poles from him, when he made a spring and jumped in front of the train, landing in the middle of the track, between the rails with his head toward the engine. It was the Sunnyland passenger train approaching, which is a fast train, running from Memphis, through Jonesboro to Kansas City. There was nobody with deceased when witness saw him at the gate to the crossing, nor when witness saw him approaching the railroad track, and that there was no other person around that witness saw, except Curtis Hurst. They were about 150 yards from the crossing, and were both looking at the train, when deceased jumped in front of it. They were on the north side of the railroad, and the highway is on the south side. That the train whistled for Herget, which is a plantation commissary; that the Sunnyland passenger train does not stop there. That, when witness first heard the train whistle, deceased was over at his car. That after the train whistled, the deceased came walking up towards the track, stopped before he reached the rails, and was looking toward the train. He was about five feet from the track when he stopped, at the time the train was crossing the trestle, about a quarter of a mile away. While the train was traveling this quarter mile, deceased stood beside the

track, with his hands on his hips, looking toward the train. He did not say anything that witness could hear, before he made the movement to get between the rails. That he made the leap to get between the rails when the train was about 2½ telegraph poles away. The movement deceased made was a swift one. He did not stumble or fall between the rails, but he jumped, and as he did so he slung his hands like that (indicating) making a jump. When he landed between the rails, he was on his feet. He threw his hands back and fell toward the engine on the track and on his back, throwing his hands back from his head, and just as his head went down between the rails the train went over him. This occurred about 9:08 A. M.

"Curtis Hurst, who was the next witness, stated he was thirty-two years of age. Did farm work; lived two miles south of Truman, in Poinsett County, Arkansas, and that he had a family. That he saw deceased February 5, 1930, at the road crossing mentioned. The highway and railroad run parallel, about sixty feet apart, and there is a wire fence between them. That the right of way is enclosed with fences, with a gate at the crossing. That, when witness first saw deceased the latter was walking by the railroad, coming up the incline of the crossing, towards the rails—not walking either up or down the railroad property, but traveling north or northwest, up the incline, which had been filled in for a wagon road across the railroad, and is a private crossing. Deceased was alone when witness saw him, walking up the private incline. That after deceased went up the private road incline, toward the railroad track he walked up within a short distance of the rails and stopped, put his hands on his hips and watched the train as it was approaching him. That, when it approached within a short distance the deceased just ran and jumped in front of the train, jumping parallel with the train —that is, he jumped with the train, like the train was going, and he was right in front of it when he laid down. The train was traveling from Memphis, toward Jonesboro, in a northwesterly direction. The movements of deceased were toward the northwest also. It looked to witness like deceased jumped about middle ways of the track, that is midway between the two rails. When he landed he was facing northwest, with his back to the train, and after he landed between the two rails, he put his hands right at the back of his head and laid backwards on the track, between the rails. That before he ran and jumped between the rails he was looking toward the train. That when deceased first came up near the rails he stopped and began to watch the train, which was about at the trestle, and that deceased continued to look at the train as it approached, until he made the leap to get between the rails. It was a fast train, between Memphis and Kansas City. It was probably running about sixty miles an hour, but witness stated that he could not give an estimate as to how far the engine was from the deceased at the time

he jumped between the rails, but it appeared to him that it was not very far. He said that deceased did some good jumping to get in front of it, and immediately after he landed between the rails he fell backwards between them. That as soon as he struck the gravel between the rails the train struck him. That he had not seen deceased before, except as he came up on the railroad, and did not know him, but learned later who he was. Witness was somewhere between 150 and 200 yards away from the point where deceased was killed, and that there was nothing to obstruct his view. He could hear the noise of the train as it approached. That the railroad is on a dump, along there, but did not know the height of it, but estimated it to be five or six feet. The track is level; the crossing ties and rails are laid on rock ballast. That deceased just turned around and went to jumping the way the train was going, like he was trying to jump in front of it. That the jump was made from the side of the track opposite from where witness was.

"That, when deceased made the first jump, the train was not very far from him. He could not tell how far it was when he made the second jump, but it was right on him, and that, when he made the third jump, the train was mighty close, and nearly hit him, but it did not hit him before he hit the ground. That the train must have been within a rail when the third jump was made. That the tracks of deceased were by the rail, where he made his third jump. That from the way it appeared to him deceased was standing up at the side of the track waiting for the train to come over.

"On re-direct examination, witness testified again that deceased came up the incline and stopped before he got between the rails, and was looking to the southeast, at the train, or in its direction; that he continued to look in that direction until he made the jumps; that he did not hesitate between the jumps, but did them in a hurry, and that, after he got to the point which is midway between the two rails, he did not hesitate before he leaned backwards, toward the train, and it looked like he intended to lean back; and that he did not make any effort to cross over the rail, to the other side, before the train struck him.

"On further cross-examination by counsel for respondent, witness was asked whether or not he could say the act of deceased was done designedly or purposely, or because of the fact that the train was so near him, and that he was making an effort to get out of the way, and witness replied, 'It did not look that way to me.'

"The third witness, Leo Alberto, testified that he was acquainted with deceased for only a short while, and saw him on February 5, 1930, on the track after the train hit him. He did not then know who he was. Witness was attracted by the train whistling so much and so loud. When he was about 200 yards back—that as he came near, he saw deceased standing by the track three or four feet from

it, and then at about that time deceased got on the track, the train was still blowing its whistle when it hit deceased. He said that, when he (witness) was about 200 yards away, deceased walked up by the railroad track and got up close to the rails. That he stopped two or three feet from the track and was looking east, towards the train, as it was coming about 200 yards from the crossing. Deceased looked towards where the train was coming and remained in that position a short while; when the train was very near to him he got on the track and stood there for a moment. That witness then turned away, because he knew the train was going to get deceased, and he turned his head and looked away. That he did not stop after deceased was killed, because he had business in Herget to attend to right away. That when he came back there were two or three people there, but he does not know who they were, but thinks they were people working in a field.

"While it is true that respondent, in this case, furnished the agent of the insurance company the certificate of the coroner's verdict at the inquest, she did so at the solicitation of the company's agent, who himself sent it to the company with the proofs of death. Therefore respondent contends that it was not binding upon her as an admission. However, we do not find that in this case it is in anywise necessary to seriously consider that question.

"It is our opinion that the testimony of the three witnesses heretofore enumerated, disposes of the question of the proof of suicide, by deceased.

"Appellant contends that the only question in this case is whether death was suicidal, and insists that on that issue there was no conflict whatever, nor was there any contradiction by respondent of the three witnesses, to-wit, Houston, Hurst or Alberto.

"There being no explanation, rebuttal or contradiction of the proof or manner of death of deceased, the trial court, we think, should have sustained the demurrer at the close of the whole case, and have ordered a verdict for the respondent in the sum only of the amount of the premiums paid. [New York Life Insurance Co. v. Waters, 154 Ark. 579; Home Life Insurance Co. v. Miller, 182 Ark. 901, 33 S. W. (2d) 1102; Mayhew v. Travelers' Prot. Assn. of Amer. (Mo. App.), 66 S. W. (2d) 199; Sharp v. Supreme Council Royal Arcanum (Mo. App.), 251 S. W. 159; Grohmann v. Maccabees (Mo. App.), 237 S. W. 875; Bowdon v. Metropolitan Life Ins. Co., 227 Mo. App. 710, 59 S. W. (2d) 787.]

"It is urged by the appellant, and we think it was the duty of the trial court, to have sustained the demurrer of the defendant at the close of the whole case, or to have ordered a verdict for plaintiff, in the amount of the premiums paid, and that, in the event of the failure so to do, it is the duty of this court to reverse this cause, with instructions to the circuit court to enter up judgment for the

amount of the premiums paid. [Mayhew v. Travelers' Prot. Assn. (Mo. App.), 66 S. W. (2d) 199; Bowdon v. Metropolitan Life Ins. Co., 227 Mo. App. 710, 59 S. W. (2d) 787.]

"Conditions under which the right of insurer to a directed verdict on the issue of suicide exist are clearly stated in the annotation in 37 A. L. R., pp. 171, 172, as follows:

" 'Although in all jurisdictions the courts apparently recognize the existence of a strong presumption against suicide, the presumption is rebuttable, and it is held that an insurer setting up suicide of the insured as a defense to a recovery on a policy may be entitled to a directed verdict in its favor on the issue of suicide, if the evidence produced is so clear and conclusive as to overcome the presumption and leave no reasonable basis for a jury to arrive at any other conclusion than that of suicide. Under such conditions the issue of fact is no longer one for the jury to speculate on, and should be decided by the court by means of a peremptory instruction to render a verdict for the insurer.

" 'So, where all the evidence produced on the trial overcomes the presumption, convincingly indicates suicide, and is inconsistent with accident or murder, the insurer is entitled to a directed verdict on the defense of suicide.'

"In our opinion, the undisputed evidence in this case, including that of the conduct of deceased immediately preceding his actions in watching the approaching train, as it traveled swiftly toward him, in plain view, over the space of a quarter of a mile, and his continuing to approach the track, and finally, while the train continued to so approach him, to pause so near the track, and as the train, according to witnesses, a fast passenger, came in full view of him, moving at a speed of from fifty to sixty miles per hour, deceased sprang or leaped in front of it, to what he certainly knew to be certain death.

"To say that witnesses differed as to whether he ran forward a step or leaned back for a minute was of no consequence in the evidence, touching his conduct at the time. The human eye of even more than one person, is, we think, in the common experience of man, unable in such an infinitesimal time to definitely or accurately reflect the swift combination of movements of a man under such circumstances. It appears to us that the act of leaping in front of the train, under such circumstances as the evidence presents, could have no purpose other than suicide."

█ It is the contention of relator that the holding of the Court of Appeals in its opinion, that the testimony of the three witnesses of defendant sufficiently proves suicide of the insured "notwithstanding the jury in this case, a law case, had decided that Bowdon did not commit suicide, is contrary to the decisions in Gannon v. Laclede Gas Light Co., 145 Mo. 502; Gluck v. Abe, 328 Mo.

81, 40 S. W. (2d) 558; State ex rel. v. Trimble, 307 Mo. 536, 271 S. W. 43; and Ford v. Wabash Railway Co., 318 Mo. 723, 300 S. W. 769.'' Respondents, on the other hand, contend (1) that the record before us does not show affirmatively that the opinion assailed is in conflict with cases cited by relator or with other rulings of this court, and (2) that if we should find that conflict does exist, and that the same arises out of the fact that said opinion is based on oral evidence alone, then the opinion is also in conflict if it did not correctly rule in respect of the coroner's certificate which was a part of the proof of death. Many authorities are cited in support of these propositions.

The question of whether the admission was binding upon relator as a matter of law is a question which we think is not presented on the record before us, because it apparently was not considered or passed upon by the Court of Appeals. [State ex rel. Boeving v. Cox, 310 Mo. 367, 373.] For after stating the facts in respect of the coroner's certificate the opinion declared ''We do not find that, in this case it is in anywise necessary to seriously consider that question.'' The court then passed that matter and resolved the issue of suicide, to which it related, as a question of law arising on the parol evidence alone. In such situation the legal effect of the admission is not necessarily brought up by certiorari. The relator is in no position to complain, nor will the respondents be concerned if, as they determined, the defense was sufficient without that piece of evidence.

The cases cited by the relator are on their facts unlike the case now under consideration and the rules of law which they announce and apply are not applicable to the situation presented here. They all apply the general rule as to conflicting and substantial evidence (presumptions being absent) which is stated in the leading case of that character, Peterson v. Railroad, 265 Mo. 462, 479, 178 S. W. 182; though the Gannon case, supra, a presumptive negligence or *res ipsa loquitur* case was dealing with common-law rules peculiarly applicable to cases of that nature which involve the issue of legal presumption affecting the burden of proof; whereas the presumption against suicide which arose in this case in the plaintiff's favor affected only the burden of evidence. [Brunswick v. Insurance Co., 278 Mo. 154, 213 S. W. 45; Griffith v. Continental Casualty Co., 299 Mo. 426, 253 S. W. 1043; Landau v. Pac. Mutl. Life Ins. Co., 305 Mo. 542, 267 S. W. 370.] The general rule as summed up in the Peterson case is, that ''after a prima-facie case has once been made out the case can never be taken from the jury.''

Doubtless the relator is relying upon this last-stated rule. But, as is pointed out in Wendorff v. Mo. State Life Ins. Co., 318 Mo. 363, 369, 1 S. W. (2d) 99, ''But the rule has its exceptions. When the proof is documentary, or the defendant relies on plaintiff's own

evidential showing (or evidence which plaintiff admits to be true) and the reasonable inferences therefrom all point one way, there is no issue of fact to be submitted to the jury. [Darlington Lumber Co. v. Mo. Pac. Ry. Co., 243 Mo. 245, 147 S. W. 1052; Linderman v. Carmin, 255 Mo. 62, 164 S. W. 614; Warren v. N. Y. Life Ins. Co., 182 S. W. 98; Richey v. W. O. W., 163 Mo. App. 246, 146 S. W. 461.]''

In the Richey case cited next above it is said: ''It is true that in cases such as this, suicide is an affirmative defense and, generally, it is a defense that should be submitted to the jury as an issue of fact, but it is not true that an affirmative defense cannot be so clearly and indisputably established that its existence should not be accepted by the court as proved in law. Where all the evidence in the case is of such character that it affords no room for reasonable controversy about an ultimate fact, there can be no issue and, therefore, nothing concerning such fact for the triers of fact to determine. In each of the cases cited by plaintiff there was no room in the evidence for a reasonable inference against the fact of suicide and the issue was properly submitted to the jury. . . . But there is nothing in those cases, nor in any of the authorities we have consulted, that militates against the conclusion that the defense of suicide may be proved in law. The presumption against suicide is very strong—strong as the universal instinct for life—but it may be overcome by proof as the instinct for life, in individual instances, may be overmastered by a desire for death, and we perceive no reason in law or logic for saying that the fact of suicide cannot be established in law. The true rule thus is tersely stated by the Supreme Court of Wisconsin in Agen v. Insurance Co., 80 N. W. 1020: 'Where the reasonable probabilities from the evidence all point to suicide as the cause of death, so as to establish it, in the light of reason and common sense, with such certainty as to leave no room for reasonable controversy on the subject, a jury should not be permitted to find to the contrary and have such finding stand as a verity in the case but the question should be decided by the trial court as one of law.'

''Applying this rule to the conceded facts of the present case we must hold that the trial court erred in not peremptorily instructing the jury to return a verdict for defendant.'' The above-quoted passage was also quoted with approval by this court in Brunswick v. Insurance Co., 278 Mo. 1. c. 172, 213 S. W. 45, 50, 7 A. L. R. 1213: The decision of the respondents also finds support in the rationale of Landau v. Pac. Mutl. Life Ins. Co., supra, syllabus 4 of which reads: ''An inference of accident sufficient to take the case to the jury cannot be based on a presumption against suicide, where the occurrence resulting in the insured's injuries and death, together with all the attendant circumstances, are minutely described by eye-

witnesses, and they definitely demonstrate that his every movement was voluntary. Such a presumption is indulged only when the cause and manner of the insured's death is wholly circumstantial.''

From the citations and discussion contained in the respondents' opinion it is to be observed that the law of Arkansas is the same as that of Missouri on the issue here involved.

We find no conflict between the decision rendered by the respondents and any controlling decision of this court. In view of this conclusion we deem it unnecessary to touch upon other propositions stated in the brief. Our writ of certiorari issued herein is therefore quashed. All concur.