STATE OF MISSOURI, at the relation of J. E. DYER, Administrator of the Estate of JAMES J. DYER, Deceased, Relator, v. HON. DAVID E. BLAIR, HON. ROBERT J. SMITH and HON. JAMES F. FULBRIGHT, Judges of the Springfield Court of Appeals.—No. 38514.—178 S. W. (2d) 1020.

Division Two, March 6, 1944.

Rehearing Denied, April 3, 1944.

*Bradshaw & Fields* for relator.

*Phil M. Donnelly, Morgan M. Moulder* and *Jos. R. Stewart* for respondents; *Ray B. Lucas* of counsel.

LEEDY, P. J.—Original proceeding in certiorari to review, for alleged conflict, the opinion of the Springfield Court of Appeals in Dyer, Admr., v. K. C. Life Ins. Co., 168 S. W. (2d) 433. Said

action was on a policy of insurance on the life of James J. Dyer. The beneficiary was insured's estate, of which his son, J. E., is administrator, and who, in such capacity, brought said action as well as the proceeding at bar. The company defended on the ground of fraud in the procurement of the policy, and breach of the sound health provision thereof. Judgement went for plaintiff for $1,000.00, the face of the policy, and defendant appealed. On said appeal error was assigned on the refusal of the trial court to direct a verdict for defendant at the close of all the evidence. This assignment (the only question considered) was sustained, and the judgment reversed.

As stated in the opinion, the answer, after admitting the issuance of the policy (April 22, 1940) and the death of the insured (May 26, 1940), "then pleaded an affirmative defense that in the application for the policy, which by express provisions was made a part of the contract, the insured had represented that his health was good and free from every disease and infirmity; that he had never suffered from any ailment or disease of the nervous system, heart or lungs, stomach, intestines, liver, kidneys or bladder; that he had never had rheumatism, gout, syphilis, goitre or diabetes, and that he had never consulted or been treated by, or been in the care of any physician, healer or any practitioner; that the defendant having no knowledge of the falsity of the insured's representations, had relied upon the same and that if it had known of his unsound health it would not have issued the policy; that defendant's liability under the policy was defended against upon the theory of false representations and warranties and a breach of the insured of an alleged sound health provision of the policy, it being the contention that on the date of his application and long prior thereto insured had been treated by a physician for heart disease and for tachycardia, enlarged heart and syphilis, and that the false and fraudulent representations made by the insured were material and that the matters and things so misrepresented by him to the defendant in his application contributed to the death of the insured."

The facts on which the respondents based their said ruling, as the same appear from the opinion are (omitting policy provisions relating exclusively to the defense of breach of the sound health provision, because the opinion expressly assumes "the policy contains no valid good health provision") as follows: "The policy together with copy of the application, proofs of death of the insured and Medical Examiner's Report that accompanied the application were introduced in evidence by plaintiff.

"In insured's application, filed with the defendant, he stated that he was, at the time, in good health and free from every disease and infirmity; that he had never suffered from any disease of the brain or nervous system, heart or lungs, and that he had never had rheumatism, gout, syphilis, goitre or diabetes; and that he had never been

examined or treated by or under the care of any physician, healer or medical practitioner.

"The Medical Examiner's Report, made by Dr. Jos. W. Squibb, admittedly defendant's examining physician, which accompanied the application for insurance was also introduced. Dr. Squibb certified that he carefully examined James J. Dyer and that his general appearance as to health was good; that he found no evidence of past or present disease of the brain or nervous system, heart, lungs, genito-urinary organs, stricture or syphilis. It was shown that a subpoena had been issued by the defendant for Dr. Squibb and that a non est return was made by the officer attempting to serve the same.

"The written application made by deceased to the defendant company for the policy of insurance sued upon contained the following provisions:

" 'The above are my own full and true answers to the foregoing questions and the same, together with my answers to the questions in part two of this application, are the only statements made to the Kansas City Life Insurance Co., which, together with this stipulation constitutes my application to said company for insurance and should my application be approved, and the policy of insurance be issued, such policy and application shall be and constitute the contract between the parties hereto, and no omission, concealment or mental reservation has been made of any facts or circumstances relating to my past or present, habits, health, physical condition or family history, and I agree for myself, and for any one asserting any claim, interest or right of action hereunder, or any policy of insurance issued hereon, that any physician or other person may testify to or disclose any knowledge or information acquired in the course of any examination or treatment of me, . . .

" 'I hereby declare that all the statements and answers to the above questions are complete and true, and I agree that they shall form a part of the contract of insurance applied for. . . .'

"The evidence disclosed as shown by the proof of death that insured died of coronary thrombosis and listed no other contributory cause. On the question of the good health of the insured at the time of making the application and the issuing and delivering of the policy and prior thereto, it was admitted by plaintiff that insured had nervous trouble; that he suffered from what he called a nervous breakdown; that he had this nervous trouble as far back as 1937, continuing through 1939; that he had been treated by a Dr. Claiborne and that he had been treated in Springfield, Missouri, the latter part of 1939. He stated he did not know his father was very sick, and didn't see him often, but when he did he was usually at work; that these spells would last sometimes two or three days in 1939, depending on how hard he worked. If he had not done heavy work or exerted himself he would not have any, but if he had been

working hard or did not take care of himself he would have the attacks. To substantially the same effect, as to the illness of Mr. Dyer, was the testimony of Mrs. Veda Dyer.

"Dr. Claiborne, of Camdenton, Missouri, testified on the part of the defendant, that he had treated insured for a nervous or fast heart as far back as 1937. In August, 1939, he was called to see insured and found him in bed. He remained in bed for several days during which time the doctor made five or six calls. After the patient got up he visited the doctor's office almost every day until about October 7th, for treatment for his heart condition. The doctor stated that he did not know where he went shortly after that but that he had suggested that he go to a heart specialist—'that is, to a specialist to have his case checked—not especially the heart but more the nervous condition that made his heart beat fast.' Dr. Claiborne further testified that he detected no indication of syphilis during the time he treated the patient and made no tests therefor. He did examine his heart and stated: 'I never did find anything organically wrong with his heart; I never found any valve—no indication of murmurs. Yes, I had a stethoscope and examined his heart; if he had a leak or murmur or anything of that kind wrong with his heart I did not find it. Well, I wouldn't say any one would progress on to get a nervous heart working for long hours or driving himself to excess but a man that is inclined to be nervous might.'

"Re-Direct Examination: 'Are you sufficiently qualified from your experience, Doctor, that you would say syphilis would cause this nervous heart or nervousness like that? Ans. Syphilis might cause anything. Q. Might cause anything? A. Yes, sir.'

"Re-Cross Examination: 'Q. Syphilis can cause that? A. It can.

" 'Q. But it isn't at all likely, is it? A. Well, I don't know that I ever treated syphiletic heart.

" 'Q. In fact they are so rare that you doubt if you ever did treat syphiletic heart? A. I never did. I have known of syphilis where it affected the brain, the bone and muscles and there is no reason why it shouldn't affect the heart and it does do it but I never had that experience with it.'

"He also stated that a man could be comparatively well and within a few minutes drop over dead with coronary thrombosis; that when the insured died of coronary thrombosis he could have had the only attack he ever had and died. 'I think a post mortem would be necessary that syphilis caused coronary thrombosis. You wouldn't know without it because we never know without we see where that progress is. We suspect it but we don't know until we see it.'

"Mrs. Mary I. Vincent, a registered nurse, testified that at different times in 1939 she administered medicine to Mr. Dyer, prescribed by Dr. Claiborne, when he was confined to his bed or under an attack of sickness.

"Dr. Max Fitch, of Springfield, Missouri, who treated on an average of 20 patients a week for syphilis, stated that the insured, James J. Dyer, came to his office November 27, 1939; that at that time Mr. Dyer gave him a history of palpitations of the heart, shortness of breath, nausea, and said that in the previous few months he had had some attacks which he regarded as heart attacks in which he became short of breath and lost consciousness. At that time insured was unable to work, although he was up and around at the time. Upon examination Dr. Fitch stated that he found an irregular heart—that is, the beat irregular; that his blood pressure on the first day was 92 over 60, 'a mighty low blood pressure for a man of 48 years.' He stated he made a florescopic examination, 'by florescoping him in front of the ex-ray florescoping machine and found there were enlargements of the heart shadow in the area above the heart where the great vessels, the aeorta, and the great vessels come on, . . . ' He further stated that at that time he made a tentative diagnosis of his heart condition and blood was taken from the vein and sent to the Missouri State Board of Health in Jefferson City for a test for syphilis. Subsequently, reports were received which revealed four plus syphilis. Both the so-called Khan test and the so-called Kline test was made and the check was positive under both tests. 'His syphilis was of many years duration. . . . Of course, he had the advanced type of syphilis.' He stated that the patient came there every Sunday morning during the winter, other than one or two Sundays when the road was too bad for him to get there, from the beginning up until his death, May 26, 1940. 'He was there on the day he died and I gave him the regular injections for syphilis at that time. In the condition he was when I first examined him he would never have been cured. . . . Syphilis involves every part of the body and it mimicks every known disease. There is no organ that is free from syphilis. Mr. Dyer was dead when I arrived at the hotel in Springfield. . . . There was no autopsy and none was requested that I know of. I signed the death certificate.' He further stated that it was a well known fact that syphilis, when it involves the circulatory system involves particularly the aeorta. 'My idea of the cause of death in this particular case is that this syphiletic process or degeneration of those blood vessels either caused a thrombosis—he either died as a result of the syphiletic processes involving those coronary arteries or he died as a result of the sudden deposit in those coronary arteries when some of this tissue had been sloughed off up there in the aeorta; that is what caused his death. You would have to have a post mortem examination to tell that definitely.' He further stated that insured 'might have syphilis and still might die of coronary thrombosis induced by a number of different things than syphilis'; but that this patient 'had all the typical findings of a syphiletic heart—all the findings pointed to syphilis . . . I say

very definitely in my mind that the man died of a syphiletic heart condition. It is true, he might have died from coronary thrombosis from some other cause, as far as I know.' Dr. Fitch further stated in his affidavit sent in with the proofs of death that he disclosed all the facts about insured's previous ailments that he considered necessary; that under the circumstances he didn't consider it necessary to report syphilis in filling out the blank. 'I did it to protect the man's family.'

"Dr. Murray C. Stone of Springfield, Missouri, testified on behalf of plaintiff in rebuttal. He stated coronary thrombosis 'means the formation of a clot, blood clot on the coronary arteries. The coronary arteries are the arteries that take the blood to the heart itself and nourish it. . . . A man who has never had any apparent heart trouble before can suffer an attack of coronary thrombosis and die, say within 15 minutes. In all post mortems I have examined I have never seen one that I thought was a coronary thrombosis due to syphilis. Oh, yes, it is known in rather rare instances. I think three or four per cent . . . ' He further stated that the fact that a man has been afflicted with syphilis does not mean that he is going to die of syphilis necessarily, or that he is going to have coronary thrombosis, and if he dies of coronary thrombosis, that is no sign that syphilis caused it. The chances would be that it didn't. 'I am not saying that syphilis will not affect the heart and the organs around the heart. It will affect them. . . . A syphiletic affliction of the heart and vessels is common in the aeorta, the big vessel that comes off the heart, but it isn't common in the coronary arteries. The aeorta is the large vessel that comes from the heart. . . . It is the large artery. Yes, syphilis does affect that.' He further stated that the doctor that had seen the most of the patient should know the most about him and should be the best to give the cause of death. He also thought the reputation of Dr. Fitch was good, and that was true among the other doctors generally there in Springfield. There was some evidence offered in rebuttal, the purpose of which was to impeach Dr. Fitch.''

Relator contends that the application of the law by respondents to the foregoing facts is in conflict with decisions of this court in Wendorff v. Mo. State Life Ins. Co., 318 Mo. 363, 1 S. W. (2d) 99, and Laughlin v. Boatmen's Bank (Mo.), 163 S. W. (2d) 761. In the Wendorff case we said, "It is furthermore the general rule in such circumstances [where plaintiff has made a prima facie case, and an affirmative defense has been tendered] that the plaintiff's case cannot be taken from the jury, for he has the right to have the jury pass on the credibility of the defendant's witnesses and the weight of their testimony, though uncontroverted. Peterson v. C. & A. R. Co., 265 Mo. 462, 479, 480, 178 S. W. 182. But the rule has its exceptions. When the proof is documentary, or the defendant relies on the

plaintiff's own evidential showing (or evidence which the plaintiff admits to be true), and the reasonable inferences therefrom all point one way, there is no issue of fact to be submitted to the jury.'' The Laughlin case is to the same effect.

It is not contended that the proof on which the decision was made to turn is documentary in nature, so as to authorize the court to direct a verdict, within the first exception to the foregoing rule. Nor does the opinion undertake to bring the case within the other exception, i. e., when ''defendant relies on the plaintiff's own evidential showing (or evidence which the plaintiff admits to be true), and the reasonable inferences therefrom all point one way.'' It is true that in the facts found, reference is made to certain admissions made by plaintiff with respect to the insured's physical condition and medical treatments received by him, and not disclosed in the application; but the case is not ruled on the effect of such admissions. If it had been, there would have been no occasion to recite at length the mass of parol testimony offered by defendant in support of its affirmative defense, and to draw therefrom any conclusion stated. In any event, the plaintiff did not admit that the matters misrepresented caused or contributed to the insured's death (as in such cases as Kirk v. Metropolitan Life Ins. Co., 336 Mo. 765, 81 S. W. (2d) 333, cited in the opinion), so that question was for the jury, under the statute, Sec. 5843 R. S. Mo. '39, as follows: ''No misrepresentation made in obtaining or securing a policy of insurance on the life or lives of any person or persons, citizens of this state, shall be deemed material, or render the policy void, unless the matter misrepresented shall have actually contributed to the contingency or event on which the policy is to become due and payable, and whether it so contributed in any case shall be a question for the jury.''

From the opinion it appears that respondents, after setting forth the evidence of both plaintiff and defendant, ignoring the aforesaid rule, proceeded to weigh the evidence, and then with respect thereto to rule: ''And where, as in this case, the evidence (wholly uncontradicted) so conclusively discloses deception, fraud and intentional concealment of a serious diseased condition and treatment therefor on the part of the insured, which existed at the time of the application for insurance and for a long time prior thereto, and which contributed to or caused his death (the event on which the policy is to become payable), we are driven unalterably to the conclusion that the court was not authorized, under the evidence, to submit the case to the jury. In this conclusion we feel there is no room for reasonable minds to differ.'' In so doing, the learned Court of Appeals violated the rule of the Wendorff and Laughlin cases, supra, and the opinion should be quashed for that reason, unless conflict is avoided by the case of State ex rel. Bowdon v. Allen, 337 Mo. 260, 85 S. W. (2d) 63, which is relied on by respondents in this court. The

Bowdon case dealt with the presumption against suicide. The suit was on a policy of insurance which contained a clause that in the event of suicide, whether sane or insane, recovery should be limited to the amount of the premiums paid. Plaintiff's prima facie case was treated as being based on said presumption. The company offered three eyewitnesses who testified that insured's death was caused by his own act of voluntarily stepping in front of a moving train. The plaintiff offered no explanation or contradiction of such proof. In this situation, it was held the court should have directed a verdict for defendant. But in the case at bar, plaintiff's prima facie case was not based on any presumption, so that what was said in the Bowdon case in that regard is not applicable to the facts now before us, and, under the cases hereinabove cited, the undisputed oral testimony of defendant's witnesses would not have the effect of destroying plaintiff's prima facie case, and prevent his going to the jury.

For the conflict noted, the opinion is quashed. All concur.