STATE OF MISSOURI at the relation of PRUDENTIAL INSURANCE COMPANY OF AMERICA, Relator, v. HOPKINS B. SHAIN ET AL., Judges of the Kansas City Court of Appeals.—119 S. W. (2d) 309.

Division Two, August 17, 1938.

1050

*William C. Michaels*, *Ralph M. Jones* and *Hulen & Walden* for relator; *Michaels, Blackmar, Newkirk, Eager & Swanson* and *Ralph W. Hyatt* of counsel.

*Hunter & Chamier* and *Jerry M. Jeffries* for respondents.

COOLEY, C.—Certiorari to the Kansas City Court of Appeals, whereby relator seeks to quash the opinion of that court in a cause wherein Wilma Eagan was plaintiff and relator was defendant. Said defendant had judgment in the trial court, from which the plaintiff appealed to the Kansas City Court of Appeals. That court reversed and remanded the cause in an opinion reported in Eagan v. Prudential Ins. Co. of America, 107 S. W. (2d) 133. Relator alleges that respondents' opinion is in conflict with prior decisions of this court, to be hereinafter noticed. ■ In a proceeding of this kind we are concerned only with the question of conflict (State ex rel. Hauck Bakery Co. v. Haid et al., 333 Mo. 76, 62 S. W. (2d) 400, and cases cited), and we look to the Court of Appeals' opinion for the facts. From it we glean the following:

■ Joe Eagan held an insurance policy, issued by relator, providing for payment of $413 upon insured's death and the further sum of $413 (double indemnity) if insured's death resulted from bodily injuries solely through "external, violent and *accidental* means" (Italics ours.) The policy was in force when Eagan died. Relator paid the $413 unconditionally provided for but refused to pay the other $413 on account of alleged accidental death, and this suit, brought by Eagan's widow and administratrix (he having died intestate), was to recover said latter $413 as for accidental death.

Relative to how insured met his death respondents' opinion states:

"There are facts in evidence tending to show that, about 12 P. M. on March 20, 1935, and immediately prior to the injury from which he died, the deceased had been engaged with one Evans in an attempted burglary near Moberly, Missouri, of a building known as the Outside Inn, in which an eating place was conducted by Mr. and Mrs. Charles Harding, by forcibly breaking a window in said build-

ing some distance above the ground and attempting to enter such building through the same. The building at such time had been closed and locked for the night. No one was on the inside of the same and no one on the outside, other than Evans and the deceased. The proprietors had left and gone to Moberly, where they lived; and, for some reason, they looked up Jerry P. Mize, a police officer of that city, and took him in their car and drove back to the Inn where they came upon the deceased and Evans. When their presence was discovered by officer Mize and the Hardings, they both were on the ground below the window. When they discovered the presence and approach of the police officer, Evans immediately made an assault upon him and opened a gun fire attack on him. This attack was resisted and resulted in both the insured and Evans being shot by the police officer. The evidence does not disclose that the deceased engaged in such attack or that he, in any manner, openly resisted the attempt of the officer to arrest him. When Mize came up, the deceased backed away and crouched in a corner of the building without any manifestation of resistance, where he was shot by Mize, the officer, who stated that he was under the impression that the deceased was preparing to shoot at him. The shot took effect in the head; and the insured, within a short time thereafter, died from the effects of such wound. No weapon of any kind was found on him. Mize, the police officer, testified that he intentionally shot Eagan because he thought Eagan was going to shoot him; that, when Eagan began to crouch down in the corner of the building, he thought that he was getting into a position to shoot at him; and that he thereupon shot him."

At the trial the plaintiff requested and the court refused an instruction, F, reading:

"The court instructs the jury that it is not sufficient to avoid the policy that the death of the insured was the consequence of some illegal act of his, unless it occurred while engaged in such illegal act and as a direct result thereof; and even though you find that the deceased committed an assault on or was engaged in combat with Mize, this does not relieve defendant, if the insured had ceased from the assault or retreated as far as he could from the combat at the time he was killed."

Respondents held the refusal of said instruction to have been reversible error, saying:

"In connection with their complaint as to the refusal of instruction F, the plaintiffs point out evidence in the record from which it might be found that, at the time of the injury which occasioned his death, the insured was not engaged in an attempt to burglarize but had desisted from such attempt, if he had been engaged therein, and also evidence from which it might be found that he had never

engaged in the assault on the police officer or, if so, he had quit such assault and had retreated therefrom at the time that he was shot.

"In view of such evidence, the plaintiffs were entitled to such instruction upon their theory of the case. The propositions of law embraced therein were correct and do not appear to have been fully covered by any of the instructions given by the court upon its own motion, at least not in the manner to which the plaintiffs were entitled.

"There is evidence tending to show that, at the time that the deceased was shot and killed, he and Evans had desisted from the burglary or the attempt thereat and were not engaged therein. They were standing on the ground below the window and were not making any effort to enter the building when apprehended by the police officer, Mize. At least, the circumstances were such that it became a question for the jury whether they were engaged in an attempt at burglary at the time that Mize came upon them; and the evidence was also such that it became a question for the jury to determine whether the insured at any time engaged in the assault on Mize, the police officer who shot him, or whether, if he had ever been so engaged, he had withdrawn therefrom and retreated as far as he could from it at the time that he was shot. There is no evidence tending to show that he committed any overt act in an assault on the police officer or that he made any open manifestation at any time against such officer. It was not shown that he was armed or that he knew that Evans was armed until Evans drew his pistol and fired. When the police officer approached, he immediately retreated until stopped by the walls of the building, when he crouched down in a corner against the wall where he was at once shot by the police officer. It cannot be inferred from the mere fact that the insured was in a conspiracy with Evans to burglarize—from which he had desisted—that he was in a conspiracy to assault the police officer and shoot him. It was not a necessary consequence of his act of engaging in the burglary that he should be killed. There was no one present at the time the attempt at burglary was initiated. Neither was it a matter of probability to be anticipated that he might be shot while engaged in such burglary. It was merely possible that some one might come up and that he might be shot. The evidence tends to show that the proprietors of the building had closed it up and had supposedly left for the night. At least, they were not there when the burglary was at first attempted; and neither was any one else. Under such circumstances, the insured was not required, at all events, to anticipate injury while burglarizing the premises. He might have anticipated that injury was possible and not that it was probable. It might be said from the evidence that the sole cause of his death was the assault by Evans upon Mize and the response of Mize thereto, with which Eagan may have had nothing to do. At least, it was a question for

the jury to determine, under these circumstances, whether or not he had anything to do with it. There is evidence tending to show that he did everything humanly possible to avert injury to himself. It is a general principle of law that, although several parties enter into a conspiracy to do a wrongful act, there is a place for repentance so that, before the act is done, any one or all of the parties may abandon their design. [State v. Webb, 216 Mo. 378, 115 S. W. 998.]

"Whether the insured had abandoned his design to burglarize the building and whether he had engaged in the assault on the police officer, Mize, and afterward withdrawn from such before he was shot, were questions for the jury. It was error to refuse the instruction."

Relator contends that in so holding respondents contravened decisions of this court and the principles of law announced therein, in State v. Adams, 339 Mo. 926, 98 S. W. (2d) 632, 637; 108 A. L. R. 838; State v. Linders, 299 Mo. 671, 253 S. W. 716; State v. Vaughan, 200 Mo. 1, 98 S. W. 2; State v. Parr, 296 Mo. 406, 246 S. W. 903; State v. Nasello, 325 Mo. 442, 461, 30 S. W. (2d) 132, 138.

In State v. Adams, supra, the defendant was convicted of murder in the first degree for the killing of an officer, Clarence Green. Just preceding the homicide Adams and two accomplices were engaged in burglarizing a filling station. Adams contended that the burglarious enterprise had been abandoned and that Green was shot by another of the burglars for which he was not responsible. The evidence showed that Adams and two accomplices had broken into the filling station, at night, had carried out and deposited on the ground certain articles and had gone back, presumably for more loot, when Green with three others drove up. The three burglars fled, leaving their intended loot. Green and one Brown followed in pursuit. Several hundred feet from the filling station shots were fired by one or more of the fleeing burglars and Green was killed. Adams contended that he had not fired such shots and could not be convicted of murder in the first degree on the theory of homicide committed in the perpetration of burglary, if, as he claimed, said fatal shots were fired by one of his accomplices, without his connivance or consent, after they had abandoned the burglarious enterprise and fled. The trial court had told the jury in an instruction, No. 8, in substance that homicide committed in the perpetration or attempted perpetration of burglary was murder in the first degree; that burglary or attempted burglary consisted not only in the burglarious breaking and entering and seizing property with intent to steal but included asportation and continued until the property had been reduced to the unmolested dominion of the burglars; and that if Green was killed by Adams or others with whom he knowingly acted in concert while engaged in the perpetration or attempted perpetration of burglary as defined in the instruction the homicide was murder in the first degree.

In discussing said instruction and the defendant's contention on that question the court said,—339 Mo. l. c. 932, 98 S. W. (2d) 636:

"The appellant's motion points to the undisputed evidence showing that when the officers approached the filling station the three accomplices abandoned the burglary and all dominion over the property they had seized, and fled from the premises, the fatal shooting occurring thereafter. He maintains that under these facts the homicide was not committed in the perpetration or attempted perpetration of the burglary within the meaning of the statute; and that he cannot be held guilty of murder in the first degree on that theory, either as the actual killer, or as a co-conspirator in the antecedent burglary if the fatal shot was fired by another of the trio."

The court then pointed out that in some jurisdictions the law was as the defendant contended, in others contra, citing cases; that most of the cited cases were cases in which the initial offense was robbery, in which asportation is necessary to complete the offense but that asportation is not an essential element of burglary. The court then said, 339 Mo. l. c. 933, 98 S. W. (2d) 637:

"If the foregoing view be correct, that asportation does not prolong the crime of burglary beyond the felonious breaking and entering, Instruction No. 8 in this case was wrong. But we think it is unnecessary to decide that point, because the great weight of authority takes a broader view of the whole question. It is held in many jurisdictions, including Missouri, that when the homicide is within the *res gestae* of the initial crime and is an emanation thereof, it is committed in the *perpetration* of that crime in the statutory sense. Thus it has been often ruled that the statute applies where the initial crime and the homicide were parts of one continuous transaction, and were closely connected in point of time, place and causal relation, as where the killing was done in flight from the scene of the crime to prevent detection, or promote escape. The same rule has been followed in cases of *attempted* robbery where there was no asportation, the robbers being compelled to flee without obtaining any property. That this is the prevailing doctrine in this country is shown by the following cases: (Citing many cases.)

"The undisputed evidence in this case shows the killing of Green was of the *res gestae* of the burglary. Instruction No. 8, if it was erroneous in the respect above pointed out, was error in favor of the appellant, rather than against him, because it allowed a conviction on the theory that the homicide was committed in the perpetration or attempted perpetration of the burglary, only if the jury found the killing was done during the actual burglary or the asportation of the property sought to be taken.

"Another assignment in the motion for new trial challenges said Instruction No. 8 on the ground that it 'only partially declares the law . . . for the reason that said instruction assumes that the robbers

1056

cannot abandon their dominion over the stolen property.' We suppose this refers to the part of the instruction stating that the perpetration of a burglary includes the act of asportation, and continues until the stolen property has been reduced to the unmolested dominion of the burglars. That statement is too broad as a general proposition, or at least is ambiguous. It doubtless means the perpetration of a burglary continues *during the asportation* until the property has been reduced to the unmolested dominion of the burglars. It obviously would be wrong to say unqualifiedly that the perpetration of the burglary continues until the burglars have acquired complete dominion over the stolen property. Circumstances might intervene to prevent them from ever doing that. But the instruction could have done no harm in this case, because, as we have shown, the undisputed evidence shows the homicide was committed within the *res gestae* of the burglary, and the question of asportation and possession was immaterial.

"IV. Another kindred assignment in the motion for new trial is that the trial court failed to instruct upon all the law of the case in that it failed to tell the jury if the appellant and his accomplices abandoned the burglary and the stolen property before the killing occurred, then the homicide was not done in the perpetration of the burglary and they should thereupon determine from the evidence whether the killing was done in such manner as to constitute murder in the first degree, second degree, or manslaughter. We know of no rule requiring the trial court to give such an instruction as a part of the law of the case under Section 3681, Revised Statutes 1929 (Mo. Stat. Ann., p. 3227); if it had been given it would have been little more than a converse of the instruction which the court did give. Furthermore, since the admitted facts showed the homicide was committed within the *res gestae* of the admitted burglary perpetrated by the appellant and his two accomplices, he was not entitled to an instruction on murder in the second degree or manslaughter."

The legal principle enunciated in State v. Adams, supra, finds recognition, we think, in State v. Linders, State v. Vaughan and State v. Parr, supra, though those cases seem not so nearly in point on the facts as the Adams case. See, also, State v. Nasello, 325 Mo. 442, 461, 30 S. W. (2d), 132, 138, which recognizes that escape from a robbery was a continuation of and within the *res gestae* of the robbery. However, in that case the court held that there was evidence tending to show a conspiracy not only to rob but to kill, if necessary, anyone who might interfere with escape. It appears to us not so nearly similar to the instant case in its facts as the Adams case.

Refused Instruction F first says that it is not sufficient to avoid the policy that insured's death was the consequence of "some illegal act of his," unless it occurred *"while engaged in such illegal*

*act* and as a direct result thereof.'' (Italics ours.) What ''illegal act'' was referred to—the burglary, the assault on Mize, or perhaps an attempted escape? The instruction gives the jury no guide by which to determine that question. If it referred to the burglary, as may well have been and probably would have been understood by the jury, it failed to inform them or give them any guidance as to what was meant by the words ''while engaged in such illegal act and as a direct result thereof.'' If, when officer Mize appeared, insured and his confederate, Evans, were engaged in the commission or attempted commission of burglary and thereupon attempted to escape it would seem, under our ruling in the Adams case that what happened in the attempted escape was within the *res gestae* of the burglary and an ''emanation thereof.'' Note the language ''Thus it has been often ruled that the statute (Sec. 3982, R. S. 1929, Mo. Stat. Ann., p. 2778, making homicide committed in perpetration or attempted perpetration of burglary murder in the first degree) applies where the initial crime and the homicide were parts of one continuous transaction, and were closely connected in point of time, place and causal relation, as where the killing was done in flight from the scene of the crime to prevent detection, or promote escape.''

Said Instruction F would further have told the jury that even though the deceased committed an assault on or was engaged in combat with Mize it would not relieve defendant (relator) if deceased had ceased from the assault or retreated as far as he could from the combat at the time he was killed.

From respondents' statement of the facts we think it clear there was no evidence to justify that portion of the instruction. Respondents say there was no evidence tending to show that Eagan committed any overt act in an assault on Mize or made any open manifestation against him. It was not shown that Eagan was armed or knew that Evans was armed. Respondents' statement as a whole shows that Eagan did not *personally* assault or ''engage in combat'' with Mize. And if it may be suspected or inferred that he did we find nothing in the stated facts to justify a finding that Eagan *afterwards* withdrew and retreated from such assault and combat. From the time Evans drew his pistol and fired until the combat was over was a very brief period,—apparently a matter of seconds rather than minutes. It all happened at the place of the burglary. Under such circumstances there can be no doubt but that, under the Adams case and others above cited, if Eagan assaulted or engaged in combat with Mize he could have been properly convicted of murder had he survived and had Mize been killed, even though killed by Evans.

It is said that at the time he was killed Eagan had desisted from the conspiracy to burglarize. So had the defendant and his accomplices in the Adams case. They had fled from the scene of the burglary and abandoned their intended loot. There appears to have

been no evidence in that case of a conspiracy to kill in order to effect escape. The killing was treated as of the *res gestae* of the burglary.

It seems to be conceded that if Eagan was killed in the commission of a felony there can be no recovery as for accidental death. No point is made on that proposition and we need not discuss it. If his death resulted under the circumstances and in the manner above indicated, we think he was, in legal effect, so killed. If homicide committed in escaping or attempting to escape is of the *res gestae* of the initial crime so must the attempted escape be considered.

We think Instruction F was properly refused and that the opinion of the Court of Appeals in holding its refusal to have been reversible error is in conflict with State v. Adams, supra, and the principle of law announced in the other cases above mentioned.

■ In line with the foregoing we mention respondents' condemnation of given Instruction 5B, which respondents say "told the jury that, if it found from the evidence that Eagan and Evans were jointly engaged in an attempt to burglarize the Outside Inn and while so engaged, Evans, without just cause, shot at Mize (a police officer who was attempting to arrest him and Eagan for attempted burglary) and that at said time Eagan and Evans knew or had reasonable cause to believe Mize to be armed with a dangerous weapon and that Mize on being shot by Evans shot and killed Eagan, then the death of the said Eagan was not accidental and its verdict should be for the defendant."

Respondents say that said instruction was erroneous, for that it directed a verdict and purported to cover the entire cause, but took no note of the evidence tending to show that the insured and Evans were not engaged in a burglary at the time insured was killed or of the evidence tending to show that the insured never assaulted Mize, or, if he did, that he had retreated. Said instruction required the jury to find that insured and Evans *were jointly engaged* in an attempt to commit burglary and that *while so engaged* Evans without just cause shot Mize, an officer who was attempting to arrest the two for such crime, whereupon Mize shot said burglars. On such facts, if found, the insured, under the authorities cited above, would have been equally guilty with Evans of murder, had Mize been killed, and was himself killed while in and as a direct result of the commission of a felony.

It is our conclusion that the opinion and judgment of the Court of Appeals should be quashed. It is so ordered. *Westhues* and *Bohling, CC.,* concur.

PER CURIAM:—The foregoing opinion by COOLEY, C., is adopted as the opinion of the court. All the judges concur.