PANSY BERNE, APPELLANT, v. THE PRUDENTIAL INSURANCE COMPANY OF AMERICA, A CORPORATION, RESPONDENT.—129 S. W. (2d) 92.

St. Louis Court of Appeals. Opinion filed June 6, 1939.

*Fordyce, White, Mayne, Williams & Hartman* and *R. E. LaDriere* for respondent.

*Ralph W. Hyatt* of counsel.

180

*Julius L. Block, Cecil Block* and *Arnot L. Sheppard* for appellant.

McCULLEN, J.—This suit was brought by appellant as plaintiff against respondent as defendant to recover the total sum of $540 and interest on two policies of life insurance issued by defendant insuring the life of Louis Berne, deceased, who was the son of plaintiff.

The suit was begun in a justice of the peace court in the City of St. Louis, and thereafter was appealed to the circuit court of said city, where it was tried before the court and a jury, resulting in a verdict in favor of plaintiff against defendant for the full amount sued for plus interest. Defendant's motion for a new trial was sustained on the ground that the trial judge had erred in refusing to sustain a peremptory instruction in the nature of a demurrer to the evidence requested by defendant at the close of the entire case. From the order of the court granting the new trial plaintiff has duly appealed to this court.

It is conceded that the two policies sued on were in full force and effect at the time of the insured's death. Each of the policies contains what is called a double indemnity clause, wherein defendant agreed to pay, in addition to any other sums due under the policies, and subject to the provisions thereof, an accidental death benefit equal to the face amount of the insurance stated in said policies, upon receipt of due proof that the insured "after attainment of age 15 and prior to attainment of age 70 has sustained bodily injury, solely through external, violent, and accidental means, occurring after the date of this policy and resulting in the death of the insured within 90 days from the date of such bodily injury while this policy is in force . . ."

The issue at the trial was whether or not plaintiff was entitled to the additional amount of insurance provided for on proof of death of the insured solely by external, violent, and accidental means.

It is not disputed that the insured was shot by one Leonard Lehmkuhl and died as a result thereof within less than ninety days thereafter.

Plaintiff contends that the order of the trial court sustaining defendant's motion for a new trial was erroneous. Counsel for plaintiff argue that the policies sued on having been introduced in evidence, and it having been shown that they were in full force and effect at the time of the insured's death, and evidence having been introduced by plaintiff showing that the death of the insured was caused by violence, plaintiff made a *prima facie* case which could not be overcome by any evidence that might be introduced by defendant. Defendant concedes that plaintiff made a *prima facie* case by the introduction of the policies containing the death by accidental means clause, and her own testimony; and further concedes that a presumption of accidental death arose from the proof of death by violence, but contends that such presumption was overcome by defendant's evidence which shows that the insured was engaged in the commission of a felony and that he was the aggressor at the time he was shot.

In addition to identifying the policies sued on and introducing them in evidence, plaintiff testified that she was the mother of Louis Berne, the insured; that the insured was nineteen years old at the time of his death; that, on the Sunday before Christmas, 1934, having been notified by a police officer that her son had been shot, she went to the hospital where she saw her son, and saw that he had been shot; that he died Christmas Eve, 1934. She admitted she had been paid by defendant the face amount of both policies.

At the close of plaintiff's evidence, defendant requested the court to give a peremptory instruction in the nature of a demurrer to the evidence, which the court refused to give.

Defendant then called as a witness Leonard Lehmkuhl, who testified that he and a Mr. Mozenski had been asked by Mr. Burcher, proprietor of the Glasgow Cafe, 2831 St. Louis Avenue, in the City of St. Louis, to stay at the cafe to guard the place for him; that the cafe closed about 1:30 A. M. on December 23, 1934, after which he and Mozenski were stationed in the back room; that he heard the officer on the beat at the door of the cafe about a half hour after the place had been closed; that shortly thereafter there was a noise and the door flew open and Louis Berne (the insured) ran in and ran the whole length of the bar, then around back of the bar; that after Berne got in back of the bar, the witness walked out of the back room and called "Stop;" that Berne jumped to the side and "pulled his overcoat back." Continuing, the witness then testified:

"I had a gun in my hand and leveled on him and pulled the trigger. I shot him twice. He was then behind the bar at the cash register, and that was about 8 feet from the end of the bar where I was. The cash register is in back of the bar and was about 8 feet from where I was standing, which is about the distance I was from Louis Berne when I shot."

The witness further testified that the cash register drawer had been closed, but, at the time he shot Berne, it was open; that there was some silver money thrown out of the drawer onto the floor. He then described how Mr. Mozenski called the police, and that he, the witness, turned the gun he had used over to the police who arrived on the scene shortly thereafter. On cross-examination, the witness testified that the police did not find any weapon of any kind on Berne except a small crowbar, also referred to in the testimony as a "jimmy;" that he did not know whether the "jimmy" was on the person or clothing of Berne or not; that he had never seen Berne that he knew of before the night he shot him; that Berne was turning toward the witness at the time witness shot him the first time; that when the witness fired the second time Berne fell, but before the second shot Berne was still standing. At this point the witness testified concerning Berne:

"Q. Was he facing the back of the bar? A. He was when I hollered at him and then he sort of turned around so that he was facing me at that time. Then I fired a shot and it looked like he took a step and then I gave him the second shot. It looked like he took a step as though he was going to step toward me."

Anthony Mozenski testified, as a witness for defendant, that he was with Lehmkuhl in the Glasgow Cafe on the night in question; that not very long after the patrolman left the door, he saw somebody else at the door, and all of a sudden the door flew open and Berne came running in, went all the way around the bar to the cash register and opened the cash register; that Lehmkuhl then came out and hollered at Berne to stop and Berne "turned and reached—looked like he was reaching for something; looked like he was—I don't know—just looked —I couldn't exactly see him because he was on the other side of Lehmkuhl.

"Q. Show the jury how he did, will you? A. (indicating) That's all; pulled back his overcoat, and that's all I saw, because I ducked back, because I thought maybe he had a gun or something, and would shoot. At the time Lehmkuhl shot at him, he was facing the cash register with his back to the front bar; then he swung his overcoat around."

The witness said that he heard the shot after Lehmkuhl shouted at Berne; that he then heard the second shot and while he did not see Berne fall, he did see him as he was lying right under the cash register; that he saw some silver money lying around on the floor. The witness stated he was there when the police arrived; that he did not see or hear

of any pistol or weapon of any kind that was found on Berne's person except "just a jimmy bar;" and that the only time he saw the "jimmy bar" the officer had it in his hand and showed it to the other officers. The witness was asked by the court if he heard the cash register ring, and answered "No," it did not ring because it was not locked, it was pushed to. The witness then testified, in answer to questions by the court:

"Q. Did you hear the drawer open? A. Yes, sir.

"Q. And you actually saw him with his hands in the cash register? A. Yes, sir; I seen him with his hands in it.

"Q. Was it then that this man Lehmkuhl hollered at him? A. Yes, sir.

"Q. And, as you say, he turned to the right and made a gesture of some kind? A. Yes, sir.

"Q. And that is when this man shot him? A. Yes, sir; that is when I ducked back, because I didn't know what was going to happen.

"Q. Then you saw him— A. Laying on the floor."

Charles H. Boswell, a detective of the St. Louis Police Department, testified that, answering a radio call broadcast over the police radio, he entered the cafe about 2:45 on the morning of December 23rd, and found there two or three police officers in uniform, and saw Louis Berne lying back of the bar directly under the cash register drawer, which was open; that he knew Berne very well; that he assisted in removing Berne from back of the bar, and when he was moved they found what is known to the police department as a "jimmy" which was lying under Berne; that they took Berne to the City Hospital; that he (witness) later made an investigation around the cafe (also referred to in the testimony as the tavern), and found "jimmy" marks on the front door and doorsill and also in the door. "I fitted the jimmy I found into that indentation, and it fitted." That no pistol was found in Berne's clothing. The witness further testified that, when he arrived at the scene, the cash register was open and several pieces of silver were lying on the floor.

Henry Wagman, police officer of the City of St. Louis, gave testimony corroborating that given by Detective Boswell with respect to the finding of the "jimmy;" that he compared it with a mark on the door of the cafe and found that they fitted; that, upon his arrival at the scene, Mozenski and Lehmkuhl were standing there and Berne was lying down in the space used by the bartender between the front and rear bar; that the cash register drawer was open and there were some pieces of change lying on the floor.

Contending that the trial court erred in granting a new trial on the ground that it had erroneously refused to direct a verdict for defendant at the close of all the evidence, plaintiff argues that her *prima facie* case could not be overcome by any evidence introduced by defendant regardless of what such evidence showed or the *quantum* thereof; that

the jury had a right to, and, in view of its verdict did, disbelieve defendant's evidence. Plaintiff cites a number of cases in support of her contention, chief among them being Gannon v. Laclede Gas Light Co., 145 Mo. 502, 516, 46 S. W. 969, which is one of the leading cases in this State on the practice of our courts in relation to the sustaining or overruling of a demurrer to the evidence. That case holds that the general rule is that once a *prima facie* case is made out for plaintiff, the trial court cannot direct a verdict for defendant. The general rule stated in the Gannon case is not applicable to all cases notwithstanding the sweeping language which appears in that case. In subsequent cases by our Supreme Court, the general rule has been held to be subject to an exception to the effect that, when the proof is documentary, or the defendant relies on plaintiff's own evidential showing, or evidence which the plaintiff admits to be true, and the reasonable inferences therefrom all point one way, there is no issue of fact to be submitted to the jury. [Wendorff v. Missouri State Life Ins. Co., 318 Mo. 363, 369, 1 S. W. (2d) 99, 101, and cases cited therein.] The general rule announced in the Gannon case and in other cases following that case has been held by our Supreme Court to be subject to a further exception where plaintiff's *prima facie* case is based upon a presumption. [State ex rel. Bowdon v. Allen et al., 337 Mo. 260, 85 S. W. (2d) 63.]

The Bowdon case, *supra*, was a suit on a policy of insurance, in which there was a provision excluding payment for suicide while sane or insane. Said provision was the basis of the defense. The policy had been issued in Arkansas and was governed by the laws of that State, but no attack had been made upon the validity of the provision against suicide. There was a verdict and judgment for plaintiff. The defendant insurance company appealed to the Springfield Court of Appeals. That court, after a review of the evidence and the law, held that the evidence showing that the insured committed suicide by jumping in front of a moving train was such that it overcame the presumption against suicide because it convincingly indicated that the death was suicidal; that such evidence was inconsistent with accident or murder; and that the insurer was entitled to a directed verdict in its favor. The evidence showed that the insured had walked up an embankment of the railroad track and there waited until an approaching train was within a very short distance of him; that he was looking at the fast-moving approaching train and jumped right in front of it and was instantly killed. The case went to the Supreme Court on *certiorari* on the application of plaintiff who, as relator therein, contended that the holding of the Springfield Court of Appeals that the testimony of defendant insurer sufficiently proved the suicide of the insured, notwithstanding the jury in the case, a law case, had decided that Bowdon did not commit suicide, was contrary to the decision in Gannon v. Laclede Gas Light Co., 145 Mo. 502,

46 S. W. 968, and a number of other Supreme Court decisions cited by relator. The Supreme Court *in banc,* answering relator's contention, said that the cases cited by relator were not applicable. The Supreme Court pointed out that the Gannon case, *supra,* was a presumptive negligence or *res ipsa loquitur* case, dealing with common law rules peculiarly applicable to cases of that nature which involves the issue of a legal presumption affecting the burden of proof, whereas the presumption against suicide, which arose in the Bowdon case then under consideration, affected only the burden of evidence. [State ex rel. Bowdon v. Allen et al., 337 Mo. 260, 268, 85 S. W. (2d) 63, 67. In support of its holding in the Bowdon case, *supra,* the Supreme Court cited Brunswick v. Standard Accident Ins. Co., 278 Mo. 154, 213 S. W. 45, 7 A. L. R. 1213; Griffith v. Continental Casualty Co., 299 Mo. 426, 253 S. W. 1043; Landau v. Pacific Mutual Life Ins. Co., 305 Mo. 542, 267 S. W. 370.]

In the Bowdon case on *certiorari* the Supreme Court quoted with approval from Richey v. W. O. W., 163 Mo. App. 235, 246, 146 S. W. 461, wherein it was held that suicide is an affirmative defense and generally should be submitted to the jury as an issue of fact, but that, where all the evidence in a case is of such a character that it affords no room for reasonable controversy about an ultimate fact, there can be no issue and therefore nothing concerning such fact for the trier of facts to determine. The court quoted with approval the following from the Richey case, *supra*:

"The true rule thus is tersely stated by the Supreme Court of Wisconsin, in Agen v. Insurance Co., 105 Wis. 217, 80 N. W. 1020, 76 Am. St. Rep. 905: 'Where the reasonable probabilities from the evidence all point to suicide as the cause of death, so as to establish it, in the light of reason and common sense, with such certainty as to leave no room for reasonable controversy on the subject, a jury should not be permitted to find to the contrary, and have such finding stand as a verity in the case; but the question should be decided by the trial court as one of law.' " [State ex rel. Bowdon v. Allen et al., 337 Mo. 260, 269, 85 S. W. (2d) 63, 68.]

The opinion and decision of the Springfield Court of Appeals holding that all the evidence in the case overcame the presumption against suicide, entitling the insurer to a directed verdict in its favor, was held to be correct. [State ex rel. Bowdon v. Allen et al., *supra.*]

In the recent case of State ex rel. Prudential Ins. Co. of America v. Shain et al. (Mo.), 119 S. W. (2d) 309, Division No. 2 of our Supreme Court held that the insurer was not liable as for the "accidental" death of the insured under a double indemnity clause of a life insurance policy which provided for benefits for accidental death or injury, where the evidence showed the insured was killed by a police officer in attempting to escape from the scene of an attempted burglary, and the death of the insured resulted from the *res gestae* of the

burglary or was an emanation thereof. In that case the policy was exactly similar to the policies in the case at bar in so far as the provisions covering accidental death are concerned. In that case, as in the case at bar, there was no provision in the policy excluding coverage if the death of the insured occurred in connection with violation of law. There had been a judgment for defendant insurer in the trial court and plaintiff appealed to the Kansas City Court of Appeals, where the judgment of the trial court was reversed for the refusal of instructions requested by plaintiff as well as for the giving of an instruction on behalf of defendant.

Plaintiff in that case had contended that, although the deceased insured had participated with a companion named Evans in the commission of an attempted burglary, he had, at the time he was shot by a police officer, withdrawn and had retreated as far as he could to a wall before he was shot. It had been further contended by plaintiff therein that the deceased insured had taken no part in his companion Evans' shooting at the police officer, following which the police officer shot and killed the insured. The Court of Appeals held that whether the insured's death when shot by the police office was accidental within the coverage of the double indemnity clause of the policy was a question for the jury under the evidence indicating that, while the insured and his companion were attempting the burglary, they were surprised by the police officer and the insured's companion resisted arrest but the insured had withdrawn from the attempted burglary and had retreated when he was shot. Our Supreme Court quashed the opinion of the Court of Appeals, and stated that it seemed to be conceded that, if the insured was killed in the commission of a felony, there could be no recovery as for accidental death; that no point was made on that proposition and it would not be discussed. The court further said, however, that, if the death of the insured resulted under the circumstances and in the manner indicated, the court was of the opinion that the insured was in legal effect so killed, that is in the commission of a felony, for the reason that the attempted escape was of the *res gestae* of the original crime. [State ex rel. Prudential Ins. Co. of America v. Shain et al. (Mo.), 119 S. W. (2d) 309, 314.]

The recent case of Winton v. Metropolitan Life Ins. Co. (Sup. Ct. Tenn.), 124 S. W. (2d) 712, was a suit to recover under the double indemnity clauses of two insurance policies, in which the sole question was whether or not the death of the insured was accidental. A judgment for the defendant had been affirmed by the Court of Appeals, and the plaintiff petitioned the Supreme Court of Tennessee for *certiorari*. In its opinion denying the writ of *certiorari*, the court stated that the contention in the Court of Appeals and in the circuit court was that the evidence taken as a whole afforded material evidence of accidental death, and that such issue should be submitted to the jury, the claimant's contention being that upon the facts an inference

arose which the jury might legitimately draw to support the claim of accidental death. The evidence showed that the deceased insured, a negro man, was out on a "wild party;" that he was drinking; that the party visited a house run by a woman of ill repute, where deceased made himself so obnoxious that he was ejected; that this aroused him to anger, and he remained on a balcony making threats to kill the first party who appeared. He was last seen crouching down holding a knife in his hand, and a witness heard him make one of his threats. The next seen of the deceased he was found unconscious with his skull fractured by a blow, and with a knife lying by his side. He died without regaining consciousness. It was conceded that his death was from external violent means and there was no contention that he committed suicide. There was a directed verdict in the trial court for defendant. The Court of Appeals of Tennessee took the view that the insured was killed in a difficulty in which he was the aggressor. In upholding the trial court and the Court of Appeals and denying the writ of *certiorari*, the Supreme Court of Tennessee referred to the recent cases of McGuire v. Metropolitan Life Ins. Co., 164 Tenn. 32, 46 S. W. (2d) 53; and Mutual Life Ins. Co. v. Distretti, 159 Tenn. 138, 17 S. W. (2d) 11.

In the McGuire case, *supra*, it was held that one who is shot to death in the act of committing a burglary is not accidentally killed because a reasonable man should foresee that death or injury might result. In the Distretti case, *supra*, the same rule was applied where the deceased exposed himself to gunshot fire from robbers who were escaping from his premises.

Price v. Occidental Life Ins. Co., 147 Pac. 1175, decided by the Supreme Court of California, was a case in many respects similar to the case at bar. The policy involved therein insured "against bodily injuries . . . effected directly and independently of all other causes through external, violent, and accidental means (suicide, sane or insane, not included)." Plaintiff's complaint alleged a cause of action based on the death of the insured. There was a judgment for defendant and plaintiff appealed. The findings of the trial court, which raised the question to be decided, were that Price sustained bodily injuries from a bullet entering his body from a revolver discharged by one Frank Cates by reason whereof Price died, but that the death of Price did not result from accidental causes. Plaintiff therein contended on appeal that the specific findings as to the cause and manner of Price's death conclusively established that the death resulted from violent, external, and accidental means, and that the finding that death did not result from accidental means was a mere conclusion at variance with the specific facts found. Answering plaintiff's contentions, the Supreme Court of California said:

"The plaintiff was bound to establish as a part of her case, that death resulted from accident. It was not incumbent on the defendant

to negative accident. The insuring company was not relying upon any exception, forfeiture, breach of warranty, or other affirmative ground of defense. The contract was one which insured against death resulting from injuries 'effected directly . . . through external, violent, and accidental means.' In order to recover, the plaintiff was bound to allege and prove an injury of the kind covered by the contract; . . . Whether or not Price's death resulted from accidental means was a material issue presented by the pleadings, and the finding on this issue was one of fact. . . .

"The fact that the insured was killed by a bullet from a firearm discharged by another person would, standing alone, justify, if not require, the inference that the killing was, as to the insured, accidental. . . . But this is an inference which may be overcome by other evidence. If it should appear that the killing had been the result of an encounter with deadly weapons, and that the deceased had himself invited and brought on such conflict, the fatal result would not have been accidental, so far as he was concerned." [Price v. Occidental Life Ins. Co., 147 Pac. 1175, 1176.]

In the Price case, *supra*, plaintiff therein cited and relied upon the case of Lovelace v. Travelers Protective Ass'n, 126 Mo. 104, 28 S. W. 877, 30 L. R. A. 209, 47 Am. St. Rep. 638, which is one of the cases relied on by plaintiff in the case at bar to support her contention herein. Referring to the Lovelace case, *supra*, the Supreme Court of California said, and we think properly so:

"There the deceased had engaged in a quarrel, in the course of which he was killed, but it did not appear that he drew a weapon, or that he knew his opponent was armed. It was very properly held that the killing was 'accidental' because the circumstances did not show that the insured 'voluntarily assumed the risk of death.' Here, however, in the absence of the evidence produced below, we must take the facts to be that Price did voluntarily assume the risk of death. If he did, the findings are reconcilable, and support the judgment." [Price v. Occidental Ins. Co. (Sup. Ct. Cal.), 147 Pac. 1175, 1176.]

The judgment for the defendant insurer was affirmed.

Summarizing the evidence in the case at bar, it appears without any dispute whatsoever that the insured, while in the very act of committing burglary and larceny, a felony under our law, was shot by one who had been requested by the proprietor of the cafe to guard the premises. The case is not one of circumstantial evidence but is one in which eyewitnesses testified that they saw the insured break and enter the cafe, saw him pull open the cash register, saw him put his hands into the drawer thereof where there was money, and, when called upon to stop, they saw him pull back his overcoat in a manner which indicated that he was attempting to draw a gun, and saw him take a step toward Lehmkuhl who was leveling a pistol at him at the time and who then fired the shots which caused the insured's

death. That positive testimony stands undisputed in the record, and the witnesses who gave it were not impeached in the slightest degree. Their credibility was not even questioned.

Can it reasonably be said that the death of the insured, under such circumstances, was an accidental death within the meaning of the policies? We think not.

While there is no provision in the policies in the case at bar excluding coverage for death of the insured occurring as a result of or while violating the law, we nevertheless believe that the presumption of accidental death which arises from death by violence cannot reasonably be said to be sufficient to require submission of the case to the jury where, in a case such as this, the insured voluntarily entered upon the commission of burglary and larceny, and thereby placed himself in a position of assuming the risk of being killed if he should be discovered and should make an attempt at resistance such as the threatening gesture of pulling back his overcoat as though to draw a gun. The killing of the insured under such circumstances certainly could not have been in the contemplation of either of the parties, when they entered into the contract, as being death by accidental means. It is true the policies herein did not *exclude* coverage for death resulting from, or occurring while the insured was engaged in, the violation of law, but it must also be remembered that they did not *include* such a death. If the policies had included any such provision, it could not be enforced because it would be clearly against public policy to enforce a contract wherein an insurer agreed to pay an additional benefit for the insured's death resulting from or occurring while committing a felony. The mere statement of such a proposition carries its own condemnation. Such a provision in a contract would clearly tend toward an inducement to the commission of crime. If a contract of insurance which would tend to induce the commission of crime could not be enforced because against public policy, we are unable to perceive how a beneficiary can recover the extra death benefits on a policy which does not contain such coverage, where, as in the case at bar, the evidence all unequivocally shows the insured's death occurred while he was actually committing a felony, and was making a threatening movement toward the person who was trying to prevent the complete consummation of the crime. [See Piotrowski v. Prudential Ins. Co., 141 Misc. Rep. 172, 252 N. Y. Supp. 313; and Burt v. Union Central Life Ins. Co., 187 U. S. 362.]

In the case at bar burden of proof was on plaintiff throughout the case to establish by a preponderance of the evidence that the death of the insured was caused by accidental means. She introduced no evidence whatsoever, either direct or in rebuttal, as to the circumstances and the manner in which the insured received the shot which resulted in his death. Whatever right plaintiff had to have her case submitted to the jury was therefore based upon the presumption of

accident arising from the death of the insured by violence. We believe that such a presumption is in the same class as the presumption against suicide, which our Supreme Court says may be overcome. The presumption relied on by plaintiff herein affected only the burden of going forward with evidence and did not involve the burden of proof. The burden of proof of death by accidental means remained upon plaintiff throughout the case. On this record, we think reasonable minds would agree that plaintiff not only wholly failed to meet that burden, but that on the contrary defendant's evidence convincingly and conclusively showed that the insured's death was not caused by ''accidental means'' within the meaning of the provisions of the policies. Hence, there was no issue of fact to be submitted to the jury. The positive, clear, and undisputed evidence of defendant showing that the insured's death resulted from a gunshot wound he received while in the very act of committing a felony must, under the decisions of our Supreme Court heretofore referred to, and in the light of the weight of authority throughout the country, be held to be such as to have overcome the presumption of accident arising from the mere proof of death by violence relied on by plaintiff. We are, therefore, of the opinion that the trial court was justified in granting defendant a new trial on the ground that defendant's request for a directed verdict in its favor at the close of all the evidence should have been sustained.

The conclusion we have reached makes it unnecessary to discuss any of the other points raised by the parties herein.

The judgment of the trial court granting defendant a new trial is affirmed and the cause is remanded so that such new trial may be had. *Hostetter, P. J.*, and *Becker, J.*, concur.