Helen **TOOLE**, Dependent **Widow of Earl A. Toole**, Deceased **Employee, Appellant,**

v.

**BECHTEL CORPORATION, Employer,**

and

**Pacific Indemnity Company, Insurer, Respondents.**

No. 45182.

Supreme Court of Missouri.

Division No. 2.

June 11, 1956.

Motion for Rehearing or to Transfer to Court En Banc Denied July 9, 1956.

Peter Cosmas and Thomas L. Sullivan, St. Louis, for appellant.

Albert I. Graff, Courtney S. Goodman, and Malcolm I. Frank, St. Louis, for respondents.

EAGER, Presiding Judge.

The present appeal is from an order of the Circuit Court reversing an award of the Industrial Commission in favor of claimant. Claim was filed for the death of Earl A. Toole, claimant's husband, and she was awarded, on December 21, 1954, the sum of Thirty Dollars per week for four hundred weeks, or until her prior death or remarriage, plus burial expenses and medical aid. It was admitted, expressly or by necessary inferences: that the deceased was, at the time of his injury, an employee of Bechtel Corporation, the employer; that the parties were subject to the Missouri Workmen's Compensation Law, Section 287.010 et seq. RSMo 1949, V.A.M.S.; that the employee died on April 23, 1953, as a result of injuries sustained on February 6, 1953, while an employee; that the employer was insured by Pacific Indemnity Company; that the claimant was and is the only dependent; and that the average weekly wage of deceased was at least Sixty Dollars. The answer of the employer was essentially a general denial, but the actual and sole issue developed was whether the injury arose out of and in the course of the employment. The findings of the Commission will be referred to later.

The deceased, Earl A. Toole, was a laborer, 50 years old, living in St. Louis. He had been working as such for this employer for a year or more on a large construction

job in St. Louis County, specifically, a plant for Lever Bros. He was brought to this job by his brother-in-law, Richard C. Williams, the labor superintendent. Deceased had no children of his own, but his wife had a grown son and a daughter, one or more grandchildren, and also nieces and nephews; two of these nephews were working on this same job.

About two months prior to February 6, 1953, Williams, the labor superintendent, placed deceased in charge of the "toolroom" where all tools for the laborers and carpenters were kept and issued. This "room" was actually a space in the southeast corner of a galvanized steel warehouse building, enclosed on two sides by the building wall and on the other two by a partition of poultry wire with wooden framework. To the west of this "room" was a space used by the pipefitters for storing and issuing material; a door made of two by fours and poultry wire led from the toolroom into this pipefitters' space. Another door in the south building wall led from the pipefitters' space to the outside; this door was fitted with a Yale lock, whereas the inner wire door was locked with a hasp and a padlock. There was a sliding window at the south end of the toolroom through which tools were issued, and there were various bins where the tools were kept. An employee known on the job as Barney Barts (sometimes spelled Bartz, and whose real name was said to be Albright or Aubright) was in charge of the material for the pipefitters.

There was no requirement that deceased remain in the toolroom at lunch time, but he often ate his lunch there. He had been instructed that when he left he should lock the wire door. About 90% of the employees ate lunch on the premises; for the lunch period was only half an hour, from 12:00 to 12:30. Williams, the labor superintendent, testified that he put deceased in charge of the toolroom because he had "not been feeling good" and the job was "getting short," i. e., they were cutting down the force; later on re-direct examination he said that a previous substantial loss of tools, which the superintendent had told him about, was "one reason I took the other man out."

On Friday, February 6, 1953, Toole was seen at his regular work about 11:00 A. M. and perhaps as late as noon; at about 12:20 P. M. a workman called in to a small group of laborers eating lunch in the nearby labor shed that the man in the toolroom had been hurt; they, including two or three of deceased's relatives, ran to him. They found no one else in the building, the outer door open and the wire door leading to the toolroom open. Deceased was lying on the floor in about the center of the toolroom; his head was bloody and there was a pool of blood on the floor; the top of his thermos bottle and most of a cigarette were on the floor in or near the blood, as was his cap; the bottle was on a bench. It was first thought that he had been struck on the head, and some time elapsed before it was learned that he had been shot. He was conscious but spoke only of pain and of his legs. An ambulance was called and he was taken promptly to the St. Louis County Hospital. It was found that he had been shot four times, once in the right temporal region, once in the lower left side (that bullet lodging near the spine), and twice in the left leg. He was operated on that night, chiefly to suture a perforated intestine, but no attempt was ever made to remove the bullets from the more serious wounds.

No one was found who admitted hearing any shots. Several witnesses testified that when deceased was found, or shortly thereafter, they saw nothing in the toolroom which appeared to have been disturbed or to be out of order; one witness, a partner of one of deceased's nephews by marriage, testified that when he was later placed in charge of the toolroom at 1:30 P. M. for the remainder of the afternoon, some tools were on the floor and some on benches (which apparently seemed out of place to him), but he admitted that he did not really know whether this was unusual or not. By 1:30 P. M. many persons had been in the place. The testimony of this witness, taken as a whole, was rather equivocal. All testified that there was nothing seen to indicate a fight or struggle; there was no evidence whatever that anything was missing from the toolroom, either on the date deceased

was shot or at any time during the period when he had been in charge.

Barney Barts was said to have left the plant at 4:30 P. M. on February 6, 1953; no one, however, testified to seeing him at any time after the shooting, and various witnesses testified that they did not see him after that date. An arrest order was issued for him, the officers looked for him, and he was presumably a fugitive at the time of the hearing. Investigation was made by the sheriff's office and by the local police; no one was found who saw the shooting, although one witness testified that deceased stated that one Baker and another were present. Baker declined to testify at the coroner's inquest. The other man flatly denied all knowledge of the shooting. There was much evidence from claimant's witnesses that deceased had never had any quarrels, disputes or trouble with anyone on this job; there had been no labor violence and only a few apparently minor jurisdictional disputes which were promptly settled by the Building Council. For whatever it may be worth, there was evidence that deceased had served a term for manslaughter in the Illinois Penitentiary beginning about 1926. The actual record was excluded on objection. There was also considerable evidence that he was a peaceful man and that he got along well with everyone. The entire transcript of the evidence taken at the coroner's inquest was received in evidence, and certain of our references to the facts are taken from that evidence.

In the hospital deceased had a private room for eight to ten days; he was then put in a two-bed room with one Ross who had been shot, and upon whom there was a sheriff's guard. There was considerable controversy concerning the rationality and mental condition of deceased after he was shot. The claimant and most of her witnesses testified, in substance, that he was "not himself," except perhaps for a few minutes at a time, and that he very frequently talked of impossible things; however, he was not unconscious and he frequently did talk. He recognized the family and spoke to them. The hospital pathologist described the physical injuries, and from the hospital record, stated that Toole developed hallucinations "about a month after admission," but that during periods when he did not have hallucinations he was "apparently considered normal." His physical condition gradually declined, and a purulent meningitis developed, with terminal pneumonia. He died on April 23, 1953.

The deceased did not tell any of his relatives the circumstances of the shooting, nor the identity of the person who shot him. Some of them asked him about this, but he either remained silent, closed his eyes, or (to one) said that this was "his business" and that they had nothing to do with it. There was evidence that three deputies of the sheriff's office talked with him on different occasions about the shooting; one was the special deputy who was guarding Ross in a nearby room and had become acquainted with Toole; the other two were regular deputies who had been assigned to the investigation. The special deputy, Uttendorf, testified: that deceased told him that he was sitting on a keg drinking his coffee, when Barney Barts came in, as he thought, to show him a revolver; that, however, Barts came up to him and started firing; that they had had no quarrel, that there was no reason for it, and that Barts could not have had any reason; that he had had an argument with one Baker, but did not explain what. This witness further testified that deceased told him the same things on one subsequent occasion, but thereafter would say no more; that sometimes his talk was rambling. The testimony of the two regular deputies, one of whom, Burke, testified only at the coroner's inquest, was in substance: that on the evening of the shooting deceased merely closed his eyes when they attempted to question him (which is entirely understandable); that a day or two later they questioned him again, and he then stated that, as he sat in the toolroom on a keg, another employee came in, cursed him and shot him; that this was done without any reason and that he did not know why he was shot; that he knew who his assailant was, but that he would not give his name; that deceased seemed rational at the time and made direct answers. Burke testified

at the coroner's inquest that about four or five days after the interview just related, and after they got Uttendorf's report, deceased corroborated to them his statement to Uttendorf and named Barney Barts as his assailant, but further said, when he was told that there was an arrest order out for Barts: "don't bring him around here because I won't identify anybody." These men apparently talked to deceased on at least five or six occasions. Both Burke and Mueller testified that deceased subsequently became reluctant to discuss the matter; Burke said that deceased stated that "he didn't want anybody taking care of his trouble; if he got well he'd take care of it." Burke also said that deceased "possibly" would not tell his relatives anything because he did not "want them to be involved." These two deputies made official reports of their first three interviews with the deceased.

On February 12, 1953, six days after the shooting, an attorney for the insurer, accompanied by an official court reporter of a division of the circuit court, interviewed deceased in his hospital room with no one else present, and took a statement in question and answer form. This was written at the time in shorthand and was later transcribed. Both the typed version and the shorthand notes were introduced and read at the hearing. We have examined both and they differ only in nonessential details. The substance of this statement was: that the shooting occurred during the lunch hour, just as deceased had eaten his sandwich and was drinking his coffee; that his assailant was an employee "with the steamfitters," that the shooting had no connection with his work or duties whatsoever, that the assailant was not trying to steal anything and deceased was not trying to protect the property; that the man just walked up to him and started shooting and he "just went berserk; that's all"; that he shot deceased twice, and then shot twice more after he fell; further, that deceased had had no trouble or argument with the man whatever, that he had no business with him on the job, and that he was "supposed to be friendly." Deceased also denied any

and all connection with a supposed "payroll pool" on that job. He stated that he preferred not to give the name of his assailant, but said also that the "police" had it, although he had not given it to them. In this statement deceased also gave many details such as his address, the period and types of employment, the date of a previous injury, his various family relationships, the numbers of certain union locals and the method of operating the toolroom. In this statement the answers are direct and to the point. It seems to be admitted on all sides that deceased had never had any form of trouble or difficulty with any one on this job, except for a possible quarrel with one "Baker," which stands wholly unexplained.

Both the referee and the Commission awarded compensation to claimant, with substantial allowances for medical expense and burial, totalling $13,721.28. On the essential issue here, i. e., whether the shooting arose "out of" deceased's employment the Commission found that the death "arose out of something intimately connected with his employment." The circuit court reversed this award, and in doing so filed an instructive memorandum opinion.

The burden is always upon the claimant to show that the injury in question arose "out of and in the course of" the employment. Duff v. St. Louis Mining and Milling Corp., Banc, 363 Mo. 944, 255 S.W. 2d 792, 794; Mershon v. Missouri Public Service Corp., 359 Mo. 257, 221 S.W.2d 165; Seabaugh's Dependents v. Garver Lumber Mfg. Co., Banc, 355 Mo. 1153, 200 S.W.2d 55. Since it is fairly well established that deceased was eating, or had just eaten, his lunch at the place of his employment and in his usual procedure, we think that the injury may be considered as having occurred "in the course of" his employment. Ricketts v. Story Laundry & Dry Cleaning Co., Mo. App., 155 S.W.2d 536, 539; Jackson v. Euclid-Pine Inv. Co., 223 Mo.App. 805, 22 S.W.2d 849, 851. His actions at the time were incidental to his employment and might reasonably have been anticipated by the employer. The vital, and indeed the sole, issue here is whether the injury arose

"out of" the employment, or more, properly stated, whether the finding of the Commission that it did so arise may be sustained. An injury arises "out of" the employment when there is a direct causal connection between the injury and the employment; and, even though the precise injury need not have been anticipated, it must have been a rational consequence of some hazard connected with the employment. Long v. Schultz Shoe Co., Mo.App., 257 S.W.2d 211; May v. Ozark Central Tel. Co., Mo.App., 272 S.W.2d 845. This issue must be decided in each case upon its own facts and no formula is applicable Foster v. Aines Farm Dairy Co., Mo., 263 S.W.2d 421.

It has been held that when an employee is found injured at a place where his duty required him to be, a rebuttable presumption arises that he was injured in the course of and in consequence of his employment. Mershon v. Missouri Public Service Corp., 359 Mo. 257, 221 S.W.2d 165, 167. But it has also been held that such presumption, being merely procedural, disappears when the employer produces substantial rebutting evidence on the issue, and that thereafter the issue must be determined solely on the evidence as though no presumption had ever existed. Duff v. St. Louis Mining and Milling Corp., Banc, 363 Mo. 944, 255 S.W.2d 792; Michler v. Krey Packing Co., Banc, 363 Mo. 707, 253 S.W.2d 136. In such event the presumption may not be weighed as evidence. This rule is applicable generally and is not confined to compensation cases. State ex rel. Waters v. Hostetter, 344 Mo. 443, 126 S.W.2d 1164; Berne v. Prudential Insurance Co., 235 Mo.App. 178, 129 S.W.2d 92; Reliance Life Ins. Co. v. Burgess, 8 Cir., 112 F.2d 234. Although the presumption completely disappears in such event, the evidence from which the presumption arose remains in the case, together with the reasonable inferences which may be drawn therefrom. Duff v. St. Louis Mining & Milling Corp., supra; Michler v. Krey Packing Co., supra. We have deemed it necessary to state these recognized principles because there seems to be some confusion on the subject in the present briefs. Counsel for claimant states that the claim is not based upon any such "assumption," but upon the facts shown, including circumstantial evidence and the inferences therefrom. Counsel for the employer insist that all "inferences and presumptions" disappeared when the various statements made by the deceased were received in evidence. We hold that these statements did constitute substantial evidence; however, the inferences which might reasonably be drawn from any and all evidence remained for the consideration of the Commission. In any event, no presumption could properly be considered by the Commission.

The issue now resolves itself into two questions: (a) Is there competent and substantial evidence to support the finding of the Commission that the death arose "out of" the employment? and, (b) Is that finding contrary to the overwhelming weight of the evidence? If the first question is answered in the negative or the second in the affirmative, the award cannot stand. Wood v. Wagner Electric Corp., Banc, 355 Mo. 670, 197 S.W.2d 647; Seabaugh's Dependents v. Garver Lumber Mfg. Co., Banc, 355 Mo. 1153, 200 S.W.2d 55.

We fully recognize the oft-repeated principles urged by the claimant to the effect that we must consider the evidence in the light most favorable to her, and that the reviewing court should defer to the Commission's determination of the credibility of oral testimony; Powers v. Universal Atlas Cement Co., Mo.App., 261 S.W.2d 512; Francis v. Sam Miller Motors, Mo., 282 S.W.2d 5; Cobler v. Leonhard Confectionery Co., Mo.App., 138 S.W.2d 728. But, on the other hand, the Commission may not arbitrarily ignore competent, substantial and undisputed evidence and base its findings upon conjecture or personal opinion. Sanderson v. Producers Comm. Ass'n, 360 Mo. 571, 229 S.W.2d 563, 567; Palm v. Southwest Missouri Wholesale Liquor Co., Mo.App., 176 S.W.2d 528.

We look now to the evidence, direct and circumstantial, to see what there may be to support the finding that the shooting arose

"out of" the employment. We shall examine this first without reference to the various statements and admissions made by deceased, for the claimant insists that these could be wholly disregarded. The deceased was shot while in his place of employment and there is a hearsay statement in the record that there had previously been a substantial loss or shortage of tools; there was also evidence, coming in more or less as an afterthought, that this was one reason for replacing the prior attendant; there is also the equivocal and somewhat conflicting evidence of one witness that when he later went on duty in the toolroom (at 1:30 P. M.) some of the tools were out of place, i. e., on the floor or on benches, but that he did not know whether this was unusual or not. We may say here that this latter evidence does not, in our opinion, constitute substantial evidence of an attempt to steal tools or of the death of deceased in protecting the property. So far as the prior shortages are concerned, the question is not what had happened before, but what occurred on February 6, 1953. All agreed that there was no evidence of a struggle. There was also evidence that Barts disappeared during or at the end of the day of the shooting; claimant's evidence showed that deceased had had no quarrels or disputes on the job. We cannot see in this evidence anything which serves as a reasonable basis for a conclusion that the shooting arose "out of" the employment, or that it was caused "by something intimately connected with his employment," as the Commission found. The wording of that finding, in itself, tends to show an inability to find anything concrete in the evidence, although the expression was used as a generality in the case of Macalik v. Planters Realty Co., Mo.App., 144 S.W.2d 158. We do not think it was advanced there as a model for a finding of fact. This evidence shows no motive or cause for the shooting and leaves it wholly unexplained unless we resort to conjecture.

The right of the Commission to disbelieve the employer's witnesses cannot, in and of itself, supply or sustain claimant's affirmative burden of proof, or supply a missing and essential element in claimant's case. Klotsch v. P. F. Collier & Son Corp., Banc, 349 Mo. 40, 159 S.W.2d 589; Spain v. Burch, 169 Mo.App. 94, 154 S.W. 172. The Commission found that the shooting was done by a fellow employee and that deceased was not the aggressor; in so doing it would seem that it thus used parts of the admissions and statements made by the insured and rejected the remainder. We do not think this proper, but even if those two findings were correctly made, they would not support the final and controlling finding that the injury and death arose "out of" the employment. There are too many possible causes and motives for such a shooting to permit a fair and reasonable inference that it was caused by or arose "out of" the employment. What was said in Seabaugh's Dependents v. Garver Lumber Mfg. Co., Banc, 355 Mo. 1153, 200 S.W.2d 55, 63, is at least applicable by analogy: "On the whole record, we hold that respondents' proof was insufficient to reasonably show that Seabaugh's death resulted from a cause for which appellants would be liable, and it extended no further than showing two causes, 'for one of which, but not the other, the defendants would be liable.' The award should therefore be, and it is, reversed."

In the case of Long v. Schultz Shoe Co., Mo.App., 257 S.W.2d 211, the claimant was shot while at her regular work by another employee who was firing at a third employee in a dispute over a nickel found on the floor. It was held that this injury did not arise "out of" the employment. The court there said, in part, loc. cit. 212–213: "* * * where the employee is assaulted or shot, not because he is an employee or because of his employment, but for reasons entirely personal and wholly disconnected from his employment, the injury in that event does not arise out of the employment so as to justify the making of an award of compensation. Lardge v. Concrete Products Mfg. Co., Mo.Sup., 251 S.W.2d 49; Ries v. De Bord Plumbing Co., Mo.App., 186 S.W.2d 488. * * * It is true that

the employment was responsible for the fact that all three women were together on the premises and subject to the employer's general right of control, but this circumstance is insufficient to show anything more than that the injury was received in the course of the employment. * * * The fact that the claimant was an innocent victim and herself nowise at fault entitles her to sympathy, but does not serve to bring her within the protection of the act." The court discussed the so-called "horse-play" cases, but held that the principles there involved did not justify the allowance of compensation for injury or death due to a homicide or other criminal offense, merely because the employment had brought the victim and the offender together. Recovery was denied and the case reversed with directions, because the injury did not grow out of, or have any direct relation "to the details of the work itself."

In Lardge v. Concrete Products Mfg. Co., Mo., 251 S.W.2d 49, this court held that an injury and death resulting from an assault by a fellow employee upon the deceased while he was actually working, did not arise "out of" the employment when the cause of the assault was a personal quarrel, and that the assault must be directly related to the work to permit an award of compensation. See also: May v. Ozark Central Tel. Co., Mo.App., 272 S.W.2d 845; Ries v. De Bord Plumbing Co., Mo.App., 186 S.W.2d 488. In Foster v. Aines Farm Dairy Co., Mo., 263 S.W.2d 421, the court said, loc. cit. 428: "It has been written that, 'when the assault is unconnected with the employment, or is for reasons personal to the assailant and the one assaulted, or is not because the relation of employer and employee exists, and the employment is not the cause, though it may be the occasion, of the wrongful act, and may give a convenient opportunity for its execution, it is ordinarily held that the injury does not arise out of the employment.' 58 Am.Jur., Workmen's Compensation, § 265, p. 765 at page 766." We find that the evidence in the present case wholly fails to show, either directly or by fair inference, that the assault upon Toole was directly related to the work of his employer.

It will be impossible to discuss all of the cases cited by counsel for claimant. Of these, the cases of Kaiser v. Reardon Co., 355 Mo. 157, 195 S.W.2d 477; Macalik v. Planters Realty Co., Mo.App., 144 S.W.2d 158; Stephens v. Spuck Iron & Foundry Co., 358 Mo. 372, 214 S.W.2d 534; and Arnold v. Wigdor Furniture Co., Mo., 281 S.W.2d 789, seem to be more appropriate for discussion. In the Stephens case the record contained affirmative evidence that the assault arose out of an argument about working on Saturdays. In the Macalik case a foreman was shot by a nightwatchman whose disclosed and apparently only motive was a deep resentment because the foreman had recently discharged the watchman's son. In the Arnold case the evidence affirmatively showed the circumstances of the shooting and fairly indicated an accidental shooting; the case was remanded for consideration of certain statements made by deceased concerning the purpose of carrying a shotgun in the cab of the truck; the court held that if he carried it for the protection of himself and the employer's property, his acts were reasonably related to the employment, otherwise not. In the Kaiser case there was direct evidence that the assailant, employed by the same employer as the deceased, went to the company warehouse where deceased was in charge for the purpose of getting paint for a friend of his; he testified that before he got to any discussion of the paint, he and deceased got into a personal argument, that deceased knocked him down, and he shot deceased. The Commission, apparently disbelieving this story, made an award of compensation and this was upheld. It will be noted, however, that there was in that case affirmative evidence that the purpose for which the assailant went to the warehouse was one related to the business; this was apparently used as the basis for an inference that the controversy resulted over the paint. We think that case is distinguishable, but we further think that its doctrine should most certainly not be extended.

 For an additional reason we hold that the award may not be sustained. The various and sundry statements and ad-

missions of the deceased were wholly un-contradicted or impeached except for the somewhat vague assertions of claimant and her relatives that he was irrational at all times after the shooting, except perhaps for a few minutes at a time. The latter testimony is opposed to the only medical evidence in the case, and to the context of a rather lengthy and detailed statement taken from deceased by an official court reporter in question and answer form, in which deceased stated many details of various matters and subjects. To the layman this statement seems entirely rational. In these statements, considered collectively, deceased stated that the assault, although made by a fellow employee, had nothing to do with the employment and had no connection with his work, that the assailant was not trying to steal anything, that deceased was not protecting the property, and that he had had no trouble with the man previously, about the work or otherwise. The making of these statements was testified to by five different witnesses and covered a period of approximately seven to ten days after the shooting. The testimony of one of these witnesses, the special deputy sheriff, was and is especially attacked as incredible, but we may disregard it entirely and the result would be the same. We do not hold that these statements were conclusive; but they may be considered when we consider the over-all effect of all the evidence and whether the Commission "could have reasonably made its findings, * * * upon consideration of all the evidence before it;" Michler v. Krey Packing Co., Banc, 363 Mo. 707, 253 S.W.2d 136; this is especially true of the statement taken in question and answer form by the court reporter. We recognize that we cannot substitute our judgment for that of the Commission, but we hold that the finding of the Commission that the injury and death arose "out of" the employment is contrary to the overwhelming weight of the evidence, and that the award cannot stand.

The order and judgment of the circuit court reversing the award of the Industrial Commission is hereby affirmed.

All concur.